[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 442 
Max Landon Payne was convicted of three counts of capital murder. Ala. Code 1975, § 13A-5-40. Count one charged intentional murder committed during an abduction with the intent to accomplish or aid the commission of robbery or flight therefrom (§ 13A-5-40(a)(1)); count two charged intentional murder during an abduction with the intent to inflict serious physical injury (§ 13A-5-40(a)(1)); and count three charged intentional murder during a robbery in the first degree (§13A-5-40(a)(2)). A sentencing hearing was held before the jury, in accordance with §§ 13A-5-45 and-46, and the jury recommended a sentence of death by a vote of 11-1. Thereafter, the trial court held another sentencing hearing in accordance with *Page 443 
§§ 13A-5-47 through -52, and, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation, sentenced Payne to death. Payne appeals his conviction, raising five issues. He does not question the sufficiency of the evidence to support his convictions. Nevertheless, after reviewing the record, we find that the evidence was sufficient for the jury to exclude every reasonable hypothesis except that of guilt and to find him guilty of the offenses charged in the indictments beyond a reasonable doubt. In fact, the evidence of guilt was strong and convincing.
On March 23, 1992, Braxton Brown, the owner of West Point Grocery in Cullman, Alabama, was robbed, abducted, and subsequently shot two times in the face with a shotgun. He died as a result of the shotgun wounds and his body was found the following day in Crooked Creek.
The state's evidence tended to show that Payne was at his sister's house, where he was living at the time, in the company of his girlfriend and two other people in the early evening hours of March 23, 1992. Sandra Walker, Payne's girlfriend, testified that she did not know the two individuals with Payne. The three left at around 6:00 p.m. Payne returned to the house about 10 minutes later and went to the closet and removed his double-barreled shotgun. Wilma Faye Easterling, Payne's sister, asked Payne why he needed his shotgun. Payne replied "In case somebody fucks with me." Walker identified Payne's double-barreled shotgun in court.
At approximately 8:33 p.m. on March 23, 1992, Judy Gail Byrum received an alarm from West Point Grocery. At 8:36 p.m. sheriff's deputy Jason Allen received a call that there had been a holdup at West Point Grocery. Allen notified Toby Welch, a dispatcher, who subsequently asked Gordon Nichols to respond to the scene. Nichols, a deputy sheriff with the Cullman County Sheriff's Department, responded to the call and arrived at West Point Grocery at 8:48 p.m. Nichols discovered the door of the store open and that some of the lights were off in the store. The lights outside the store were also off. Nichols also observed several packs of Marlboro cigarettes lying on the floor in front of the counter. Nichols did not find anyone in the store. He notified the dispatcher and secured the area. Bobby Watson, a sergeant with the Cullman County Sheriff's Department, arrived on the scene at approximately 9:08 p.m. He subsequently requested that an investigator be sent to the scene. Payne had been seen at West Point Grocery by two customers, Christy Sue Godsey and Becky Noone, around 8:25 or 8:30 p.m. Sometime after this and before 9:00 p.m. that evening, Payne arrived at his sister Faye Easterling's house. The victim, Braxton Brown, was with him. Sandra Walker, Payne's girlfriend, was present. At trial, Walker identified a photograph of Brown as the man with Payne that evening. Walker testified that when the two men entered the house, Easterling asked Payne what was going on. Walker testified that Brown had three bank deposit bags and two cartons of Marlboro cigarettes with him. Walker identified the three bank deposit bags at trial. Brown told Easterling that he heard that she was pregnant and also that he heard that she needed "that," referring to money. Easterling told Brown that she did not want the money. Brown asked her again to take the money and Easterling said that she did not want the money.
Walker testified that Brown appeared very nervous and scared. Payne instructed Brown to give Easterling the money he owed her. Brown took out four $5.00 bills and laid them on the kitchen table. Walker testified that Easterling and Payne then went to the bathroom, which is located next to the kitchen. Walker testified that the door to the bathroom was open and that she overheard Easterling saying "don't do this" several times.
Walker further testified that she, Payne, and Payne's two sisters had been involved in an automobile accident the week before and that Payne was wearing a sling on his left shoulder as a result of an injury he received. Walker testified that Payne had a gun in his right hand, inside the sling, on the night he arrived at the house with Brown. Walker identified a handgun at trial as the one that Payne carried that night. Walker testified that Easterling asked Payne to give the gun back to Brown. Payne refused. Then *Page 444 
Payne gave Brown the clip out of the gun. Easterling asked Payne to leave Brown with her or to take him back to his store and said that "maybe he would forget about this." Walker testified that at this point, Brown nodded in the affirmative. Payne responded "No, I am going to do this." Then Payne left with Brown.
When they were leaving the house, Payne and Brown met Ricky Smith and his wife Evelyn. Ricky Smith testified that he arrived at Easterling's house around 8:55 or 9:00 p.m. that evening. This was the last time that Brown was seen alive. Smith testified that when he walked into Easterling's house, she was crying. Easterling was speaking to Smith's wife and he overheard her say that Payne had robbed and kidnapped Brown.
At approximately 9:15 p.m., Payne arrived at George Cleghorn's house. Payne asked Cleghorn if he could use his telephone. Payne called someone on the telephone and asked them if they had any bullets for a .22 rifle. Payne also asked Cleghorn if he had any bullets. Cleghorn identified Payne's clothing at trial as the clothing that he was wearing the night of this incident.
Shortly after 9:08 p.m., Payne's sister Alma arrived at the West Point Grocery and informed Sergeant Watson that Payne was traveling in a blue Ford Maverick automobile with one missing headlight. Based on the information that Watson received from Payne's sister, Watson ordered the dispatcher to issue an all-points bulletin to be on the lookout for the automobile and to advise all officers that Payne was in the company of Braxton Brown.
At 10:00 p.m. that evening, Investigator Ted Manus was at the West Point Grocery taking pictures of the scene when he received a call that gunshots had been heard. He went to see if he could locate the origin of the shots but could not. Manus returned to the store and secured several packages of cigarettes from the store that were found on the floor. He then received a call that Brown had been seen with Payne. Manus also received information that Brown and Payne were seen together at a residence near Bethel. Manus left the store and proceeded to the residence.
Mitchell Love, an investigator with the Cullman County Sheriff's Department, arrived at Easterling's residence at approximately 10:15 p.m. Love testified that he located a blue Ford Maverick automobile outside this residence. Love had previously received word to be on the lookout for an automobile matching this description. Love notified the dispatcher that he had located the vehicle and asked for assistance on the scene. Several other officers arrived shortly thereafter. The officers looked inside the vehicle and observed several beer cans, some live and expended shotgun shells and an arm sling.
Phillip Lambert, the chief investigator for the sheriff's department, arrived at Easterling's residence. He also looked inside the Ford Maverick and observed two spent shotgun shells, several unspent shotgun shells, and an arm sling. He later called for a tow truck to have the automobile towed to the sheriff's department.
At 12:05 a.m., on March 24, 1992, Rebecca Herbstreth, a ticket agent for Greyhound Bus Lines in Birmingham, Alabama, sold someone identifying himself as James Beavers a bus ticket to Key West, Florida. At trial, Herbstreth identified Payne as the individual who claimed to be James Beavers. Herbstreth testified that she noticed that Payne was wearing a white T-shirt and torn blue jeans that had blood stains on them. Herbstreth further testified that Payne had cuts on his face. Payne gave Herbstreth a gold chain when he bought his ticket. Herbstreth identified this gold chain at trial. The chain was subsequently identified by the victim's son as one offered for sale from West Point Grocery. Payne handed out cigarettes to passengers while waiting for his bus and also helped one individual pay for a bus ticket. Herbstreth testified that Payne had tied a blue money bag to his waist that contained a lot of money. Herbstreth stated that Payne told her he received this money from the sale of his automobile.
At approximately 7:50 a.m. on the morning of March 24, 1992, a man walked into the Greyhound Bus Station in Birmingham with *Page 445 
a wallet that he had found about a block away. Herbstreth was still working. She called the Birmingham police. Herbstreth looked in the wallet and found Braxton Brown's Social Security card inside. Herbstreth identified the wallet at trial. Inside were nine different credit cards, all of which had Braxton Brown's name on them.
On March 24, 1992, Officer Mitchell Love went to Payne's mother's residence. Payne's sister, Alma Lee, was present at the residence. Lee gave Love a double-barreled shotgun that she had in the trunk of her automobile. Love identified the shotgun that he received from Lee at trial. It is the same shotgun that Walker identified as Payne's shotgun.
Also on March 24, 1992, Deputy Sheriff Sidney Yarbrough searched the blue Ford Maverick automobile that had been towed from Easterling's house the night before. Inside he found two spent shotgun shells and four shotgun shells that had not been fired. He identified these shells at trial. Yarbrough also found a blue arm sling in the automobile, which he identified at trial.
Volunteer fireman John Hardin, a resident of West Point, searched for Braxton Brown on the morning of March 24. He went to a bridge on Crooked Creek near West Point. He noticed a dark colored substance on the bridge and on the railing of the bridge. He discovered a partial dental plate on the bridge. He contacted the sheriffs department.
Phillip Lambert, Ted Manus, and Anthony Dotson arrived at the bridge. Lambert observed red stains on the bridge and the partial plate. Lambert also observed a broken set of eyeglasses and a lens on the bridge. These glasses were subsequently identified by the victim's son as belonging to his father. Manus discovered a body in the creek. When the body was brought up from the creek, Manus observed that most of the face was missing. Dotson, who was serving as the coroner on this date, was present when the body was removed from the water. Dotson testified that the victim had suffered two gunshot wounds to the face. There were two large holes in the face — one in the victim's forehead and one in his mouth. Dotson knew Brown and identified the victim as Braxton Brown.
Lambert testified that he believed that the holes in the victim's face were the result of a shotgun blast. The victim's body was taken to Moss Funeral Home and later released to Peggy Lindsey of the Alabama Department of Forensic Sciences for an autopsy.
On March 25, 1992, a detective from the Metro Dade Police Department in Miami, Florida, received a telephone call that Payne was due to arrive at the Greyhound bus station in Miami. The Cullman authorities provided Detective John Robert Butchko with Payne's description and informed him that Payne was involved in a robbery-murder in Cullman, Alabama. Butchko also received information that Payne would be carrying a green duffel bag and was probably armed. Butchko was further informed that Payne was likely traveling under the name of James Beavers.
Based on this information, Butchko arrived at the Greyhound bus station and awaited the arrival of Payne's bus. A security guard held everyone on the bus so that Butchko could identify the people exiting. Butchko approached Payne, who was carrying a green duffel bag, after he exited the bus. Payne identified himself as James Beavers. Butchko was about to pat Payne down for weapons when Payne informed him that he had a .25 caliber gun in his right rear pocket. Butchko identified a Sterling.25 caliber automatic pistol at trial as the gun that he removed from Payne's pocket. This is the same gun that Sandra Walker previously identified as the gun she saw Payne with at Easterling's house when he was with the victim. This gun was also identified at trial by the victim's son as having belonged to his father. Butchko also removed Payne's wallet from his pocket. The identification in the wallet was that of Max Landon Payne. Butchko identified the wallet and its contents at trial.
Payne was subsequently transported to the homicide division of the Metro Dade County Police. Butchko saw Payne again in an investigation room at the station. Butchko asked Payne if he could search his green duffel bag. Payne subsequently signed a *Page 446 
consent form allowing Butchko to search the duffel bag. The consent form was admitted into evidence and identified at trial. Upon searching the duffel bag Butchko found many items, including the following that he identified at trial: a jeweler's invoice made out to West Point Grocery; a Greyhound bus ticket in the name of James Beavers; a State of Alabama vehicle registration in the name of Braxton Brown; three cartons of Marlboro cigarettes; three First Alabama Bank deposit bags containing numerous checks written to West Point Grocery, credit card receipts, rings, and food stamps; bank receipts in Braxton Brown's name; $196.54 found in Payne's wallet; and, $889.30 found in the bank bags. Many of these items were subsequently identified by the victim's son as coming from West Point Grocery.
Further testimony was heard from Peggie Lindsey, an investigator with the Alabama Department of Forensic Sciences. Lindsey transported Brown's body to Birmingham for an autopsy. Dr. Joseph Embry performed the autopsy and Lindsey assisted. Lindsey testified that Embry removed around 466 shotgun pellets from the victim's skull. Lindsey also testified that Dr. Embry removed a blood sample from the victim, which she later delivered to a serologist in Huntsville. Lindsey testified that the victim died from the gunshot wounds to his head.
Brent Wheeler, with the Alabama Department of Forensic Sciences in Huntsville, examined the shotgun pellets, the shotgun and the two spent shotgun shells found in Payne's automobile. He also examined the pellets that were taken from the victim's skull. Wheeler concluded that the pellets removed from the victim's head represented the pellets of two shotgun shells, maybe three. He also testified that the two spent shotgun shells that were found in Payne's automobile were the same type of shells that had been used to shoot the victim. Wheeler further testified that the two expended shells found in the automobile had been fired from Payne's shotgun that had been taken from the trunk of his sister's automobile. Wheeler stated that the pellets taken from the victim's skull could have come from the two empty shotgun shells found in the automobile. Wheeler testified that it was his opinion that the victim was shot from a distance of one to one and one-half feet.
Morris Glen Brown, a serologist for the Alabama Department of Forensic Sciences, tested a blood sample taken from the victim. Brown testified that the victim's blood was "type — ABO, type was type O, Erythrocytic D-type 2-1 PGM, type 1, DAP, type B." Brown also tested a human tissue sample taken from Payne's arm sling. He testified that the tissue on the arm sling could have been the victim's because of "blow-back" from the shooting of the shotgun.
Roger D. Morrison, from the Department of Forensic Sciences, tested a blood sample from the victim and a blood sample from Payne. He also tested the tissue sample taken from the arm sling. He conducted an HLA DQ Alpha test for the purpose of a DNA comparison. He concluded that the tissue from the sling and the bloodstain from the victim were both of the same HLA DQ Alpha type. According to him, this type appears in approximately six percent of the population. The test he performed was an exclusionary test, and he concluded that there was a 94% chance that the tissue taken from Payne's sling was the victim's tissue. He further concluded that the tissue taken from the sling could not have come from Payne himself. Payne presented testimony from 10 witnesses in an effort to show that it was possible that another man, by the name of James Beavers, could have committed this murder. Evelyn Smith, who passed the victim and Payne as they left Easterling's house on the night of the murder, testified that she heard her husband say "Hi, James, how are you?" Smith further testified that the only James she knows is James Beavers. Kelley Mosley, who was across the street from the West Point Grocery on the night of March 23, 1992, testified that she saw a blue Ford Maverick automobile at the store at around 9:00 p.m. and that there were three people in the automobile. The one in the backseat, she testified, had shoulder-length hair. James Beavers, who has shoulder-length blond hair, testified that he lived across the street from Easterling in March 1992. Beavers testified that he did see Payne on March 23, when he *Page 447 
helped him fix his automobile. He denied having any knowledge of the crime. Christine Hyde testified that she had a conversation with James Beavers in December 1992 in which Beavers admitted to shooting the victim in the face. Becky Graves testified that she was in the West Point Grocery store at about 8:10 p.m. on March 23, 1992. She said that while she was in the store she saw a man with shoulder-length blonde hair. An affidavit from Tracey Shields was read into evidence. Shields stated that she saw Payne pull up to his mother's house at around 9:15 p.m. on March 23, 1992, and stated that she saw another person in the automobile with long hair. Payne did not testify.
The state subsequently presented several rebuttal witnesses. Most of these witnesses were people who testified that James Beavers was home on the night of this incident and that he did not leave his house on that night.
 I.
Payne contends that the prosecutor, in his initial closing argument, impermissibly commented on Payne's failure to testify.
 "Article I, § 6, of the Alabama Constitution of 1901 states, in part, that the accused in a criminal prosecution 'shall not be compelled to give evidence against himself.' This constitutional right is the basis for the requirement that a criminal defendant's failure to testify shall not be commented upon by the prosecution. Ex parte Wilson, 571 So.2d 1251, 1261 (Ala. 1990); Whitt v. State, 370 So.2d 736, 738 (Ala. 1979). In Alabama, this right is also protected by statute:
 " 'On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment.'
"Ala. Code 1975, § 12-21-220."
Ex parte Musgrove, 638 So.2d 1360, 1367 (Ala. 1993), cert. denied, Musgrove v. Alabama, ___ U.S. ___, 115 S.Ct. 136,130 L.Ed.2d 78 (1994).
The questioned comments must be reviewed under the plain error standard, Ala.R.App.P. 45A, because defense counsel made no objection to them.
 "In considering what constitutes 'plain error' in a capital case, the Alabama Supreme Court has looked to the federal court's interpretation of what is 'plain error.' See Ex parte Harrell, 470 So.2d 1309 (Ala. 1985); Ex parte Womack, 435 So.2d 766 (Ala. 1983).
 "In United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court stated that the plain error doctrine should be used to correct only 'particularly egregious errors' (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)) which are those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings' (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). Young, supra [470 U.S. at 14-18], 105 S.Ct. at 1046-47. The plain error rule should be applied 'solely in those circumstances in which a miscarriage of justice would otherwise result.' Young, supra [470 U.S. at 15], 105 S.Ct., at 1047 (quoting Frady, supra, 456 U.S. at 163, n. 14, 102 S.Ct. at 1592, n. 14).
 "Furthermore, the court noted that the plain error doctrine requires that the 'claimed error not only seriously affects "substantial rights" [of the defendant], but that it had an unfair prejudicial impact on the jury's deliberations. Only then would [a] court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice.' Young, supra [470 U.S. at 16, n. 14], 105 S.Ct., at 1047, n. 14."
Hooks v. State, 534 So.2d 329, 351-52 (Ala.Cr.App. 1987),aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050,109 S.Ct. 883, *Page 448 102 L.Ed.2d 1005 (1989), quoted in Land v. State, 678 So.2d 201,216-17 (Ala.Cr.App. 1995); Kuenzel v. State, 577 So.2d 474,481-82 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert.denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).See also DeBruce v. State, 651 So.2d 599 (Ala.Cr.App. 1993) aff'd Ex parte DeBruce, 651 So.2d 624 (Ala. 1994).
In Windsor v. State, 683 So.2d 1021, 1023-24 (Ala. 1994), the Alabama Supreme Court addressed the standard for reviewing whether a comment is a comment on an accused's failure to testify; as follows:
 "As this Court recently held in Ex parte Musgrove, 638 So.2d 1360 (Ala. 1993), 'When an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing argument[s] made to the jury. . . .' 638 So.2d at 1368. . . .
". . . .
 "Alabama, by statute, specifically protects the privilege against self-incrimination from comment by the prosecution. § 12-21-200, Ala. Code 1975. A prosecutor must be extremely careful not to overstep the mark or to break with the established protocol regarding statements about that privilege. Musgrove, supra. To improperly comment on that privilege would be a clear violation of the defendant's rights under Article I, § 6, Ala. Const. 1901, as well as the rights protected by the Fifth Amendment as that Amendment is incorporated into the Fourteenth Amendment to the United States Constitution.
 "In Ex parte Wilson, 571 So.2d 1251, 1261 (Ala. 1990), this Court cited the standard endorsed by the United States Court of Appeals for the Eleventh Circuit:
 " ' "[A] statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify." Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984).' "
It is with these principles in mind that we review the prosecutorial comments asserted by Payne to constitute comments on his failure to testify.
The prosecutor made the first comments during his argument concerning the jury's consideration of the defense's theory that James Beavers, rather than Payne, committed the offenses charged. In listing the evidence arguably indicating Beavers's guilt and the evidence arguably indicating Payne's guilt and in asking the jury to weigh one list of evidence against the other, the prosecutor stated:
 "[Beavers's] mother, Mrs. Reynolds, said he was there all that time. [His ex-girlfriend's] son, Terry, said he was there that night. The police, by their own testimony, continued to investigate. Every time they would receive an additional report, they would go out and see if they could find James Beavers. . . . The investigation continued. On each occasion, there was no evidence to tie Mr. Beavers to this situation. He was available in court to testify. Let's go over to the other side and say what evidence and what circumstances do you have against the defendant. As I say, I have always felt what a person does is more reliable than what [is] said by a third party or whoever. When we go through these, ask yourself, 'Is that consistent with a person who is not the defendant or the one that is guilty of the crime?' "
(Emphasis added.)
We find the following to be particularly applicable in this instance:
 "Because this is a case in which the death penalty has been imposed, the fact that no objection was made stating the particular ground asserted on appeal does not prevent our review of this issue. Ex parte Hart, 612 So.2d 536, 537 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450
[124 L.Ed.2d 666] (1993). However, the failure to object
 " ' "does weigh against any claim of prejudice." Ex parte Kennedy, *Page 449 472 So.2d 1106, 1111 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). "This court has concluded that the failure to object to [allegedly] improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).'
 "Kuenzel v. State, 577 So.2d at 489 (emphasis original in Ex parte Kennedy)."
Land v. State, 678 So.2d 201, 223 (Ala.Cr.App. 1995).
Not only did defense counsel evidently not consider these comments to be particularly harmful, he also pointed out that Beavers had testified. In reiterating each witness's testimony arguably pointing to Beavers's guilt, defense counsel stated:
 "What about James Beavers? You got to see him and hear him and what all he had to say. He had some criminal convictions. If I remember the evidence, he is older than [Payne]. I think they are even related in some way. Which one of them had some experience in crime? Which one of them knew the things to do?"
(Emphasis added.)
The only arguable difference between defense counsel's comment and the prosecutor's argument was that the prosecutor, after recognizing Beavers's testimony, shifted the focus to the evidence arguably supporting Payne's guilt. We consider this second remark to be akin to the comments under scrutiny inEx parte Musgrove. There, the prosecutor asked the questions "What did you hear from the defense?" and "What did you hear from the Defendant?" The Supreme Court explicitly agreed with the following interpretation of the latter question:
 " '[This comment,] when viewed in the context of the entire argument, did not refer to the appellant's failure to testify, but was rather the prosecutor's opening into a summary of the case presented by the defense. The comment was clearly not a direct reference to the appellant's failure to testify because it was not 'manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify.' [Citations omitted.] Nor was this comment an indirect reference to the appellant's failure to testify and there was no "close identification" of the appellants as the exact people who did not become witnesses. [Citations omitted.] This statement by the prosecutor was merely a general opening statement to a recapitulation of the defense's case.' "
Ex parte Musgrove, 638 So.2d at 1369 (quoting Musgrove v.State, 638 So.2d 1347, 1359 (Ala.Cr.App. 1992)), aff'd Musgrovev. Alabama, ___ U.S. ___, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).
We also find persuasive United States v. Chandler,996 F.2d 1073, 1094-95 (11th Cir. 1993), cert. denied, Chandler v. U.S., ___ U.S. ___, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994), in which the court reviewed the prosecutor's comment that the defendant, Chandler, was more culpable than one of his cohorts Charles Ray Jarrell, who testified for the prosecution. In that argument, the prosecutor made the following comments:
 "You've heard several times that in return for his cooperation in this case . . . the United States government and the State of Alabama have agreed to recommend a 25-year sentence without parole for Charles Ray Jarrell. . . .
 "Now, the defendant will no doubt argue this simply is not somehow not [sic] fair. Charles Ray Jarrell came here before you and testified before you. You were able to hear his testimony. He came in here, admitted what he did, came in here and told you what he did, what kind of person he is and [it] isn't anything to write home about, there is no question about that. But I submit to you that a man that was willing to solicit two different prospective killers on at least three different occasions, a man who was willing to provide money to people to perform the act, a man who was willing to provide weapons to complete the act and a man who is cunning and manipulative is a far more dangerous individual *Page 450 
than a self-confessed town drunk living hand to mouth who allows himself to be manipulated into actually doing this terrible act."
Id. at 1094 (emphasis added).
In reviewing these remarks, the court stated:
 "Viewed in the context in which the statement was made, we find that the prosecutor's statement was not improper. A common sense reading of the statement suggests that the prosecutor was arguing that Jarrell was not as culpable as Chandler. The argument was based, not on Chandler's failure to testify, but on the facts elicited from Jarrell's testimony. A jury would not naturally take the argument to be a comment on Chandler's failure to testify, nor is it obvious that the remark was so intended."
Id. at 1095.
Accordingly, we find that the first comments under scrutiny do not constitute plain error. See also Dill v. State,600 So.2d 343, 355 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, Dill v. Alabama, 507 U.S. 924,113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) (the court held that the comment — that Terry Dill was the "only one" from whom the jurors had heard — made immediately before the prosecutor's lengthy summation of the evidence corroborating the testimony of Terry Dill (who was in a vehicle with the victim and the defendant when the defendant shot the victim) was not a comment on the defendant's failure to testify and even if it was, it did not amount to plain error).
The second comment by the prosecutor is as follows:
 "It is pretty clear up to the point they leave the house here at nine o'clock that evening — not much conjecture can be involved as far as that. After that, that is the last time Braxton Brown was seen alive. He was with the defendant. We assume from the time frame that [Payne] left here, came back up here, and went down this road here, going back to the West Point Grocery. The conjecture arises 'What happened during that time frame?' I don't know. I don't know whether [Payne] asked for the magazine back and Braxton Brown said 'No way.' I don't know
if he saw a patrol car. You see, unbeknown to [Payne], he doesn't know any alarm has gone off. He doesn't know that the police know anything. He may have passed a patrol car going from the West Point Grocery over here to where [Payne] lives, and he may have panicked. He may have thought that Wilma turned him in. He may have thought, 'Now I have no choice.' Or he may have got down here and said, 'Braxton, I'm going to let you out here and I'm going to cut a trail here. By the time you get back up here to get help, I'll be long gone. Let's make a deal. If I let you out and you don't contact the authorities, we will forget this happened.' Maybe at that point, Braxton said, 'No way. I'm going to call the police when I get a chance.' And [Payne] ended it right there on that bridge. Then he goes to the airport or bus station and buys the bus ticket. . . . Whatever scenario you think fits, something between here and there happened. That is for you to decide. The end result is that [Payne] undoubtedly was here on this bridge and did the murder on that occasion."
(Emphasis added.)
Early in his initial closing argument, the prosecutor explained to the jury that the purpose of an investigation is to preserve the evidence and the scene for the jury to consider in the subsequent prosecution, in this case 26 months after the offense. He further stated, "It is our responsibility at this point and our duty to re-create by evidence what the circumstances were on that day." Some of his argument was couched in the terms what "we" know, e.g., "What is the next thing we know?" We conclude that, by the comments under scrutiny, the prosecutor was merely following this line of thought; the prosecutor was merely arguing to the jury that even though the prosecution had not been able to reconstruct the events of the entire evening, the evidence still pointed to Payne's guilt. See State v. Windsor, 683 So.2d at 1023 (the Court in finding objected-to comment — "If we could get into that mind over there [the defendant's] and put out here *Page 451 
what is in there, we would have no reason for a jury." — without error stated that "it is apparent that the prosecutor was referring not to Windsor's failure to testify, but rather to the State's own failure to produce direct evidence of Windsor's intent").
Moreover, we find that both defense counsel did not consider the comments in question to be particularly harmful. In fact, they used this line of argument to Payne's benefit. Early in his argument, one defense counsel said: "[The prosecutor] did say that whatever happened at that bridge, he doesn't know. The State doesn't know and they have not proven to you what happened or who did what to Braxton Brown. There are a lot of different theories that can come up." Counsel also stated that he did not know, e.g., "Whatever took place on that night, James Beavers was calculating and making plans that he didn't want to be seen with Mr. Brown that night"; and "If Mr. Beavers did in fact do the killing, he could have wiped off the gun with the sling. I don't know." The other defense counsel, in arguing that in order for the jury to convict Payne the evidence had to point to Payne's guilt beyond a reasonable doubt, stated the following: "[The prosecutor] told us a few minutes ago — maybe this happened or maybe that happened. This decision y'all are about to make is too important to be based on speculation."
Accordingly, we find that this second comment did not constitute plain error. Compare Windsor v. State, 593 So.2d 87,90-92 (Ala.Cr.App. 1991) (the court, in reviewing the prosecutor's comment — "they can't explain why [the victim's] weapon [which had been missing since immediately after his death] was in the defendant's pocket when he was arrested" — made by the prosecutor while pointing at the defendant, held that the comment was an indirect comment on the defendant's failure to testify and, further, that the comment could have been construed as alerting the jury to the defendant's opportunity to refute the prosecution's case because only the defendant could have explained why the victim's gun was in his possession) (emphasis added); Burson v. State, 373 So.2d 1239,1241 (Ala.Cr.App. 1979) (the court found the following comment to be a direct comment on the defendant's failure to testify and thus the trial court's overruling of the defendant's objections was error: "[the defendant] was hiding, in the closet. Or maybe he was just sitting in the closet. I don't know, he's not going to tell us.").
 II.
Payne contends that he was denied his Sixth Amendment right to a speedy trial because there was a 25-month delay between his indictment and the trial of his case. Payne was arrested in Dade County, Florida, on March 25, 1992, and was indicted by the Cullman County grand jury on April 16, 1992. His trial began on May 23, 1994. In Barker v. Wingo, 407 U.S. 514,92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court set forth four factors to be considered when analyzing a speedy trial claim. These factors are (1) the length of the delay; (2) reasons for the delay; (3) when the defendant asserted his right to a speedy trial; and (4) any prejudice that the defendant has suffered due to the delay. In Barker, the court stated that because these factors are interrelated, they should be considered together in light of all the relevant circumstances in a particular case. The length of the delay is the triggering mechanism for an examination of the other factors and the delay must be presumptively prejudicial in order to merit inquiry into the three other factors. Smith v.State, 409 So.2d 958 (Ala.Cr.App. 1981). Whether the length of the delay is presumptively prejudicial must be determined on a case-by-case basis. Id.
In this case, the delay between Payne's arrest and his trial was 25 months. Much of this delay can be attributed to the retirement of one judge and the recusal of two others. Until September 1993 Judge Jack Riley of Cullman County presided over this case. When Judge Riley retired, this case was assigned to Judge Frank Brunner, a newly appointed judge. Judge Brunner recused himself from hearing this case on January 12, 1994. Judge Fred Folsom was then assigned to the case. On January 24, 1994, Judge Folsom recused himself from this case and requested that the Alabama Supreme Court assign a judge. On February 3, 1994, the *Page 452 
Alabama Supreme Court appointed Judge Robert Austin, of Blount county, to try the case. Judge Austin immediately ordered a pretrial conference and scheduled the trial to begin on May 23, 1994. Thus for 6 of the 25 months that this case was pending, the delay was attributable to the problems of finding a judge who could hear the case. Payne did not file his first motion asserting his right to a speedy trial until approximately 19 months after his arrest. His first motion for a speedy trial was also entered after Judge Riley had retired. His second motion for speedy trial was filed after Judge Brunner had recused himself and his third motion for speedy trial was filed on February 14, 1994, 11 days after the Alabama Supreme Court appointed Judge Austin to the case. Payne was tried approximately three and one-half months after Judge Austin was appointed to the case.
Based on the foregoing, we conclude that the delay of 25 months was not presumptively prejudicial in light of the fact that much of the delay was due to the problem of finding a judge to hear the case. This delay is not attributable to either the prosecution or Payne. Even though we have concluded that this delay was not presumptively prejudicial, we have reviewed the record in light of the remaining three factors and find no violation of Payne's right to a speedy trial. Payne offers no evidence showing that he was prejudiced by the lapse of time between indictment and trial.
 III.
Payne contends that the trial court committed reversible error by denying his requested jury charge regarding circumstantial evidence. Payne argues that his requested charge was an accurate statement of the law, that it was not confusing or misleading, and that it was not substantially covered by the court's oral charge.
Payne requested the following jury instruction:
 "I charge you, the Jury, that if the circumstances as proven are capable of explanation of any reasonable hypothesis consistent with the Defendant's innocence and if the circumstances are capable of such explanation, then the defendant should be acquitted."
The court denied this charge and instructed the jury, in pertinent part, as follows:
 "A conviction may be had upon evidence which is partially circumstantial so long as the evidence is so strong and cogent as to prove the guilt of the defendant to a moral certainty and beyond a reasonable doubt. A conviction may not be had upon circumstantial evidence if there is an inference consistent with the innocence of the Defendant."
Payne argues that "inference," as used in the court's jury charge, does not mean substantially the same as "hypothesis," as used in Payne's requested jury charge. We disagree.
The Random House Dictionary of the English Language, (6th ed., 1973), defines "hypothesis" as
 "a proposition, or set of propositions, set forth as an explanation for the occurrence of some specified group of phenomena, either asserted merely as a provisional conjecture to guide investigation (working hypothesis) or accepted as highly probable in the light of established facts."
Id., at 702 (first definition). To "infer" is "to derive by reasoning; conclude or judge from premises or evidence." Id., at 729 (first definition).
However, the issue here does not hinge, as Payne argues, solely on the definition of "hypothesis." Rather, the focus is on "reasonable hypothesis." Reason — distinguished by common sense — is the hallmark of any reasonable hypothesis or inference. Accordingly, the state is not asked to eliminate every single hypothesis inconsistent with the defendant's guilt. In Crawford v. State, 112 Ala. 1, 21 So. 214 (1895) (quoted in Cox v. State, 373 So.2d 342, 345 (Ala.Cr.App. 1979)), the Supreme Court held:
 "It is not every hypothesis of innocence, reasonable or unreasonable, possible or imaginary, the evidence must exclude, but only such hypotheses as are reasonable, *Page 453 
springing from a consideration and comparison of the entire evidence."
Id., 112 Ala. at 26, 21 So. at 222.
In the context before us, both "reasonable hypothesis" and "inference" require an explanation that is both consistent with the evidence and agreeable to common sense. The similarity of the meaning of these words is reflected by case law in which the words are used interchangeably. See, e.g. Watley v. State,568 So.2d 852, 856 (Ala.Cr.App. 1989), cert. quashed,568 So.2d 857 (Ala. 1990) (quoted in McWhorter v. State, 588 So.2d 951
(Ala.Cr.App. 1991)).
The trial court may deny a requested jury charge that is substantially covered by the court's oral charge. Dill v.State, 600 So.2d 343 (Ala.Cr.App. 1991). We hold that Payne's requested jury charge was substantially covered by the court's oral charge. Therefore, the court did not err when it denied Payne's requested jury charge.
 IV.
Payne contends that the trial court committed reversible error by admitting evidence obtained during an allegedly illegal search of his automobile. At a suppression hearing, Cullman County Sheriff's Deputy Mitch Love testified as follows. On March 23, 1992, he received a number of radio transmissions regarding a robbery-abduction at West Point Grocery. The sheriff's deputies were given a description of the suspect, Max Payne: a white male, driving a light blue Ford Maverick, and carrying a shotgun. Love drove to Payne's residence. Payne was not there, but his mother and his sister, Wilma Faye Easterling, were. Love spoke to Easterling and to Payne's mother. Easterling told Love that when she was at her house earlier that evening, Payne had arrived with Brown, bank deposit bags, and a weapon. She further stated that Payne left her house in the Maverick with the victim. After this conversation, Love left Payne's house and continued searching for the Maverick. He found it parked at Easterling's house, and called for assistance. The automobile windows were down, and Love looked into the automobile with his flashlight. He observed empty beer cans, shotgun shells on the floorboard, a sling in the back seat, and keys in the ignition. Sheriff Laney and Officers Yarbrough, DeMonia, Nichols, and Weston joined Love at the automobile a few minutes after Love called for assistance. Sheriff Laney removed the keys from the ignition.
Sheriff Laney testified as follows. He was investigating the crime when he heard Love's call. Laney was one of the first to arrive on the scene with Love. He looked into the automobile and saw the same things Love testified to seeing. He removed the keys from the ignition and opened the trunk. The victim's whereabouts were not known at that time. Laney stated that when he looked in the trunk, he was looking for the victim.
Phillip Lambert, chief investigator for the Cullman County Sheriff's department, testified as follows. Lambert arrived after the trunk had been searched. He looked into the automobile and observed the same items Laney and Love testified to seeing, with the exception of the automobile keys. Lambert then spoke with Easterling. She told him that the Maverick parked on the property was the same automobile Payne was driving when he left with Brown. She also told Lambert that he and the other officers "could look in it, do what [they] wanted to, take it with [them] or anything [they] wanted to do." Lambert then determined that Easterling and her husband were renting the property upon which the automobile was parked. Ted Manus obtained Easterling's written consent to search the premises. The sheriff called for a wrecker, and the Maverick was towed to the sheriff's department, where it was locked and later searched.
Generally, a valid warrantless search must be accompanied by certain circumstances that would render the act of obtaining a warrant either useless or unreasonable. One such situation in which a warrant is not required is when exigent circumstances exist concurrently with probable cause. Land v. State,678 So.2d 201 (Ala.Cr.App. 1995) (holding that warrantless search of appellant's vehicle was valid because the police had probable cause to believe that appellant had committed the crime, and the vehicle's inherent *Page 454 
mobility was a sufficiently exigent circumstance); see alsoJohnson v. State, 554 P.2d 51 (Okla.Crim.App. 1976), cert. denied, 429 U.S. 943, 97 S.Ct. 364, 50 L.Ed.2d 314 (1976) (holding that immediate warrantless search of the trunk of defendant's automobile was proper, because the police believed the kidnapped victim was in there and were acting "in hopes of saving a human life").
In this case, the police had the following information before they removed the automobile keys and opened the trunk: that Brown's grocery store had been robbed by a white male with a shotgun; that the suspect was driving a light blue Ford Maverick; that Brown had been abducted; that after the robbery, Payne drove to Easterling's house in his light blue Ford Maverick; that when he arrived there, Brown was with him and he had bank deposit bags and a gun; that Payne left Easterling's house in his Maverick with Brown, the bank deposit bags, and the gun; that the Maverick was not parked in front of Easterling's house between 10:00 p.m. and 10:15 p.m., but that it was parked there at 10:30 p.m. Therefore, the police had sufficient information to " 'warrant a man of reasonable caution in the belief' " that several crimes had been committed, that the appellant had committed them, and that the vehicle contained evidence of the crimes. Texas v. Brown,460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502, 514 (1983) (quoting Carroll v. United States, 267 U.S. 132, 162,45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925)).
Furthermore, in cases involving searches of automobiles the vehicle's inherent mobility establishes a presumption of exigent circumstances. Mewbourn v. State, 570 So.2d 805, 810
(Ala.Cr.App. 1990) ("a vehicle's potential for mobility raises the presumption of exigent circumstances"). In this case, however, the vehicle's mobility was accompanied by several additional exigent circumstances. For example, the Maverick had been returned to Easterling's house less than 30 minutes before Love located it. Love testified that he called for backup and that the whereabouts of Payne and the victim were unknown at that time. Laney testified that he looked inside the automobile to determine whether anyone was hiding in the automobile. Laney further testified that he removed the keys from the ignition in order to open the trunk to search for the victim. We conclude that the police had sufficient probable cause to search the automobile, and that the concomitant exigent circumstances were overwhelming; therefore, the warrantless visual search of the interior and the trunk of the Maverick was valid.
The Maverick was later towed to the sheriff's department where it was thoroughly searched. However, before the automobile was towed, Easterling gave her express verbal and written consent to the search. In Johnson v. State,584 So.2d 881 (Ala.Cr.App. 1991), this court held:
 " 'A defendant has no constitutional right of privacy where he does not have exclusive possession and control over the place searched. The person who does have present, exclusive possession and control over the place in question, or who shares the premises coequally with the person claiming to be aggrieved, may give consent to search.' "
Id., at 886 (quoting C. Gamble, McElroy's Alabama Evidence § 334.01(3)(b) (3d ed. 1977)). See also Zumbado v. State,615 So.2d 1223 (Ala.Cr.App. 1993) (applying this rule in upholding a consensual search where the appellant parked his automobile at the house trailer where he lived with his girlfriend; the girlfriend was present, but the appellant was not; the girlfriend was apparently in exclusive control of the premises; and the girlfriend consented to the search of the automobile).
In this case, Payne parked his automobile on property rented by Easterling and her husband. Payne left the windows of the automobile down and left the keys in the ignition. Therefore, Payne did not have exclusive control over the automobile when it was searched. Easterling, in contrast, did have apparent exclusive control of the property, including the automobile. Accordingly, she was capable of giving valid consent to the search of the automobile. She gave her consent; therefore, the warrantless search of *Page 455 
the automobile at the sheriff's office was valid.
Furthermore, we note that the automobile was in plain view, and the police had probable cause to believe that the automobile itself was evidence of the crimes. See Watson v.State, 533 So.2d 737 (Ala.Cr.App. 1988) ("[P]lain view is obtained without any prior entry or opening of the vehicle. . . . when the car itself is in plain view and it is subject to seizure as evidence of a crime. . . ."); Cardwell v. Lewis,417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Therefore, the warrantless seizure of the automobile was proper.
 V.
Payne contends that the trial court erred by admitting an expert witness's DNA testimony (specifically for the genetic marker HLA DQ Alpha) without first determining the admissibility of that evidence in a hearing outside the presence of the jury.[1] Because Payne neither requested a hearing outside the jury's presence nor objected to the admission of the DNA testimony on this ground, we review this issue only for plain error, as required by Ala.R.App.P. 45A. (Payne made no pretrial motion to suppress this evidence; however, at trial, he did object to the expert's testing result, when the witness was asked that result, with the following objection: "There is no proper predicate for the scientific test reliability or requirements for the Frye case [Frye v. United States,293 F. 1013 (D.C. Cir. 1923),] which have been set out in that case have not been met.")
As authority for his argument, Payne quotes the following: "Prior to the admission of DNA testimony into evidence, a hearing outside the presence of the jury must be held to determine if the [three-pronged] test [announced in Ex partePerry, 586 So.2d 242 (Ala. 1991)] has been met." This language can be found in Yelder v. State, 630 So.2d 92, 102 (Ala.Cr.App. 1991), rev'd on other grounds, 630 So.2d 107 (Ala. 1992). Seealso Hutcherson v. State, 677 So.2d 1174, 1191 (Ala.Cr.App. 1994) (quoting this same language from Yelder). As support for this mandate in Yelder, the court cites Ex parte Perry.
However, the Alabama Supreme Court in Ex parte Perry issued no such unqualified mandate. The Perry Court stated the following:
 "Earlier, we stated that Perry contends that the trial court erred by submitting the DNA evidence to the jury without first holding a hearing concerning its admissibility. As we explain presently, we do not hold that the trial court has necessarily erred.
 "We do hold, however, that if the admissibility of DNA evidence is challenged, the trial court should conduct a hearing outside the presence of the jury to address the considerations raised in this opinion."
586 So.2d at 254-55 (emphasis added). We think that implicit in this language is the qualification that the defendant must request a hearing outside the presence of the jury.
We are so persuaded by the death penalty case Felder v.State, 470 So.2d 1321 (Ala.Cr.App. 1984), aff'd, 470 So.2d 1330
(Ala.), vacated on other grounds, 474 U.S. 976, 106 S.Ct. 376,88 L.Ed.2d 330 (1985). There, the appellant, before trial, requested an evidentiary hearing to determine the voluntariness of his confession. However, during trial, the officer who had taken the appellant's statement testified, in the presence of the jury, as to the voluntariness of the statement and, after *Page 456 
defense counsel's voir dire of the witness, counsel stated that he had no objection to the admission of the statement. In answer to the appellant's contention that he was entitled to a hearing on the voluntariness of the confession outside the presence of the jury, the court made the following observations:
 "[A]n accused is not entitled to a hearing outside the presence of the jury unless he specifically requests that it be held outside the presence of the jury. A trial judge is not required to remove the jury for the hearing absent a request by the accused. Harris v. State, 406 So.2d 1074[, 1075] (Ala.Crim.App. 1981) [("On the question of the voluntariness of a confession, the burden is not on the trial court to withdraw the jury ex mero motu, hear evidence on the question of the voluntariness of a confession outside the jury's presence, and expressly rule.")]; Gamble, McElroy's Alabama Evidence, § 200.02(5)(6) (3d ed. 1977). Defense counsel did not request a hearing outside the presence of the jury in his request for an evidentiary hearing or when he asked to examine Ward on voir dire.
 "Therefore, we hold the appellant did receive a full and fair hearing on the voluntariness of his confession and cannot now complain that such hearing was not held outside the presence of the jury."
470 So.2d at 1326. Cf. also Cliff v. State, 518 So.2d 786, 791
(Ala.Cr.App. 1987) ("an accused is not entitled to a hearing [on the voluntariness of his confession] outside the presence of the jury unless he specifically requests one").[2]
In this case, there is absolutely no implication of plain error in regard to the admission of the DNA evidence. The expert witness, in testifying to the following, generally met the requirements of a predicate for the admission of such testimony, as announced by the Perry Court: (1) there is a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results, see also Perry, 586 So.2d at 250; Yelder, 630 So.2d at 102; (2) there are current techniques that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community, see alsoPerry, 586 So.2d at 250; Yelder, 630 So.2d at 102; and (3) the testing laboratory performed generally accepted scientific techniques without error in the performance or interpretation of the test, i.e., (a) the techniques used by the testing laboratory are generally accepted in the scientific community, and (b) there was no error in the performance or interpretation of the tests. Upon this evidence, the trial court found the DNA result to be admissible. We note that the trial court had no disputed evidence before it. In fact, the cross-examination of the expert consists of less than two transcribed pages. Based on the record, the DNA evidence was properly received into evidence, and the trial court's failure to ex mero muto hold a hearing outside the presence of the jury was not plain error.
 VI.
Pursuant to Ala.R.App.P. 45A, we have examined the record in this case for plain error, whether or not it was brought to our attention or the trial court's attention. After a careful search of the record, we have found no plain error or defect in either the guilt or sentencing phases of the trial.
Pursuant to § 13A-5-53, we have reviewed Payne's sentence. This section requires this court to review the propriety of the death sentence, as well as to review the case for any error involving the conviction. This review includes a determination of the following: (1) whether error that adversely affected Payne's rights occurred during his sentence proceedings; (2) whether findings by the trial court concerning aggravating and mitigating circumstances were supported by *Page 457 
the evidence; and (3) whether death is the proper sentence in this case. Section 13A-5-53(b) requires that in determining whether death is the proper sentence, this court must determine the following: (1) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether after this court undertakes an independent weighing of the aggravating and mitigating circumstances it determine that death is considered the proper sentence; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
A separate sentencing hearing was held before the jury pursuant to §§ 13A-5-45 and -46. The jury heard evidence concerning aggravating and mitigating circumstances. It was properly instructed by the trial court on the applicable law and after being so informed returned an advisory verdict of 11 in favor of death and 1 in favor of life imprisonment without the possibility of parole.
The trial court held another hearing in accordance with §13A-5-47, in order to determine whether to follow the jury's recommendation. The trial court ordered and received a written presentence investigation report as required by § 13A-5-47(b). The trial court entered specific written findings on the existence or nonexistence of aggravating circumstances set forth in § 13A-5-49 as well as the existence or nonexistence of any mitigating circumstances set forth in § 13A-5-51 and §13A-5-52. The trial court also enumerated specific findings of fact summarizing the crimes and Payne's participation in them. The trial court found the existence of the following aggravating circumstance: "The Court makes a finding of fact that the capital offense was committed while the defendant was engaged or was an accomplice in the commission of or an attempt to commit, the offense of robbery and the offense of kidnapping." The trial court noted that this was the only aggravating circumstance argued by the state and the only aggravating circumstance considered by the court.
The trial court also considered mitigating circumstances as set forth in § 13A-5-51 and § 13A-5-52. The trial court found one statutory mitigating circumstances as set forth in §13A-5-51, Payne's age at the time of the offense. The trial court also found certain nonstatutory mitigating circumstances as set forth in § 13A-5-52. These mitigating circumstances were: that Payne was under the influence of drugs and alcohol at the time of the commission of these offenses; that Payne was undergoing some emotional problems concerning the alleged paternity of a child that he thought was his; that Payne had had a bad childhood because of his stepfather's alcohol problems, his stepfather's abuse of his sister, his mother's numerous marriages, and a generally poor childhood environment; and that Payne currently appears to have a good relationship with his family. In addition, the trial court considered the presentencing report, evidence presented at trial and at the sentencing hearings, and the advisory verdict of the jury. Payne had the opportunity to rebut the evidence contained in the presentencing report. The trial court weighed the aggravating circumstance against the mitigating circumstances and finding that the aggravating circumstance outweighed the mitigating circumstances, sentenced Payne to death.
Payne was convicted of two counts, count I and count II of the indictment, of intentional murder during kidnapping in the first degree, pursuant to § 13A-5-40(a)(1). He was also convicted of intentional murder during a robbery, pursuant to §13A-5-40(a)(2) as charged in count III of the indictment. These are capital offenses under Alabama's death penalty statute. We take judicial notice that similar crimes are being punished capitally in this state. See Heath v. State, 455 So.2d 898
(Ala.Cr.App. 1983), aff'd, 455 So.2d 905 (Ala. 1984), aff'd,474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (kidnapping-murder); Cochran v. State, 500 So.2d 1161
(Ala.Cr.App. 1984), aff'd in part, rev'd in part,500 So.2d 1179 (Ala. 1985), aff'd on return to remand, 500 So.2d 1188
(Ala.Cr.App.), aff'd 500 So.2d 1064 (Ala. 1986), cert. denied,481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987) (robbery-murder); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App. 1986), aff'd, *Page 458 519 So.2d 586 (Ala. 1987), cert. denied, 486 U.S. 1036,108 S.Ct. 2024, 100 L.Ed.2d 611 (1988) (kidnapping-murder); Davis v.State, 536 So.2d 110 (Ala.Cr.App. 1987), aff'd, 536 So.2d 118
(Ala. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766,104 L.Ed.2d 201 (1989) (robbery-murder); Boyd v. State,542 So.2d 1247 (Ala.Cr.App. 1988), aff'd, 542 So.2d 1276 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989) (kidnapping-murder and robbery-murder); Hallford v. State,548 So.2d 526 (Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342
(1989) (robbery-murder).
We have carefully searched the record of both the guilt and the sentence phases of the appellant's trial, and we have found no error warranting reversal. In reviewing the sentence, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The findings and conclusions of the trial court are supported by the evidence. We concur in the judgment of the trial court that death is the appropriate sentence in this case. Our independent weighing of the aggravating circumstance and mitigating circumstances convinces us that the sentence of death is appropriate for this appellant. We find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Accordingly, Payne's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] We conclude, from Payne's one-page argument, that he is not contesting the expert's testimony regarding the experts statistical interpretation of the test result. Payne quotes only the three-pronged test for the admission of the DNA "matching" evidence. See Yelder v. State, 630 So.2d 92, 102
(Ala.Cr.App. 1991), rev'd on other grounds, 630 So.2d 107 (Ala. 1992) (quoted by Payne and quoting Ex parte Perry,586 So.2d 242, 250 (Ala. 1991)).
We find to be significant the fact that the DNA evidence in this case is not truly "matching" evidence as that term is used in Ex parte Perry. In Perry, the expert testified that the DNA of the blood found on the victim and on the front doorknob of his residence "matched" the appellant's DNA and that the probability of finding similar DNA was 1 in 209,100,000. In the case before us, the expert testified that the HLA DQ Alpha type of the tissue from Payne's arm sling and of the victim's blood was the same, but that Payne's was different and that six percent of the Caucasian population shares this type. He explained that the test's primary function is to exclude, that it is not DNA "fingerprinting."
[2] We find cases involving the voluntariness of a confession to be sufficiently analogous to the question before us to be persuasive. We do note that confession cases entail an even greater impetus than is present here, because the rule in confession cases is "that extrajudicial confessions are prima facie involuntary and inadmissible and the duty rests in the first instance on the trial court to determine whether or not a confession is voluntary, and unless it so appears it should not be admitted." Taylor v. State, 282 Ala. 567, 569,213 So.2d 566, 569 (1968), cert. denied, Taylor v. Alabama,393 U.S. 1102, 89 S.Ct. 903, 21 L.Ed.2d 795 (1969).