Max Landon Payne was convicted on three counts of capital murder (all relating to one killing): count one charged Payne with intentional murder committed during an abduction with the intent to accomplish or aid the commission of robbery or flight therefrom, pursuant to § 13A-5-40(a)(1), Ala. Code 1975; count two charged Payne with intentional murder during an abduction with the intent to inflict serious physical injury, pursuant to *Page 460 
§ 13A-5-40(a)(1); and count three charged Payne with intentional murder during a robbery in the first degree, pursuant to § 13A-5-40(a)(2). After the sentencing phase of the trial, the jury recommended the death penalty. The trial court accepted the recommendation and sentenced Payne to death. The Court of Criminal Appeals affirmed the conviction and death sentence. Payne v. State, 683 So.2d 440 (Ala.Crim.App. 1995).
Payne raises four issues on appeal: (1) Did the Court of Criminal Appeals correctly hold that certain comments made by the prosecutor during closing arguments did not infringe upon Payne's right to remain silent? (2) Did the trial court err in failing to give certain jury charges requested by Payne? (3) Was Payne denied his right to a speedy trial? and (4) Did the trial court commit reversible error by admitting evidence obtained during what Payne says was an illegal search of his automobile?
The Court of Criminal Appeals set out the facts in its opinion. However, we feel it necessary to recite the facts as stated by that court in order to better present the issues.
 "On March 23, 1992, Braxton Brown, the owner of West Point Grocery in Cullman, Alabama, was robbed, abducted, and subsequently shot two times in the face with a shotgun. He died as a result of the shotgun wounds and his body was found the following day in Crooked Creek.
 "The state's evidence tended to show that Payne was at his sister's house, where he was living at the time, in the company of his girlfriend and two other people in the early evening hours of March 23, 1992. Sandra Walker, Payne's girlfriend, testified that she did not know the other two individuals with Payne. The three left at around 6:00 p.m. Payne returned to the house about 10 minutes later and went to the closet and removed his double-barreled shotgun. Wilma Faye Easterling, Payne's sister, asked Payne why he needed his shotgun. Payne replied, 'In case somebody fucks with me.' Walker identified Payne's double-barreled shotgun in court.
 "At approximately 8:33 p.m. on March 23, 1992, Judy Gail Byrum [an employee of the company that monitored the alarm system at the West Point Grocery Store] received an alarm from West Point Grocery. At 8:36 p.m. sheriff's deputy Jason Allen received a call that there had been a holdup at West Point Grocery. Allen notified Toby Welch, a dispatcher, who subsequently asked Gordon Nichols to respond to the scene. Nichols, a deputy sheriff with the Cullman County Sheriff's Department, responded to the call and arrived at West Point Grocery at 8:48 p.m. Nichols discovered the door of the store open and that some of the lights were off in the store. The lights outside the store were also off. Nichols also observed several packs of Marlboro cigarettes lying on the floor in front of the counter. Nichols did not find anyone in the store. He notified the dispatcher and secured the area. Bobby Watson, a sergeant with the Cullman County Sheriff's Department, arrived on the scene at approximately 9:08 p.m. He subsequently requested that an investigator be sent to the scene. Payne had been seen at West Point Grocery by two customers, Christy Sue Godsey and Becky Noone, around 8:25 or 8:30 p.m. Sometime after this and before 9:00 p.m. that evening, Payne arrived at his sister Faye Easterling's house. The victim, Braxton Brown, was with him. Sandra Walker, Payne's girlfriend, was present. At trial, Walker identified a photograph of Brown as a photograph of the man with Payne that evening. Walker testified that when the two men entered the house, Easterling asked Payne what was going on. Walker testified that Brown had three bank deposit bags and two cartons of Marlboro cigarettes with him. Walker identified the three bank deposit bags at trial. Brown told Easterling that he heard that she was pregnant and also that he heard that she needed 'that,' referring to money. Easterling told Brown that she did not want the money. Brown asked her again to take the money, and Easterling said that she did not want the money.
 "Walker testified that Brown appeared very nervous and scared. Payne instructed Brown to give Easterling the money he *Page 461 
owed her. Brown took out four $5.00 bills and laid them on the kitchen table. Walker testified that Easterling and Payne then went to the bathroom, which is located next to the kitchen. Walker testified that the door to the bathroom was open and that she overheard Easterling saying 'don't do this' several times.
 "Walker further testified that she, Payne, and Payne's two sisters had been involved in an automobile accident the week before and that Payne was wearing a sling on his left shoulder as a result of an injury he received. Walker testified that Payne had a gun in his right hand, inside the sling, on the night he arrived at the house with Brown. Walker identified a handgun at trial as the one that Payne carried that night. Walker testified that Easterling asked Payne to give the gun back to Brown. Payne refused. Then Payne gave Brown the clip out of the gun. Easterling asked Payne to leave Brown with her or to take him back to his store and said that 'maybe he would forget about this.' Walker testified that at this point, Brown nodded in the affirmative. Payne responded, 'No, I am going to do this.' Then Payne left with Brown.
 "When they were leaving the house, Payne and Brown met Ricky Smith and his wife Evelyn. Ricky Smith testified that he arrived at Easterling's house around 8:55 or 9:00 p.m. that evening. This was the last time that Brown was seen alive. Smith testified that when he walked into Easterling's house, she was crying. Easterling was speaking to Smith's wife and he overheard her say that Payne had robbed and kidnapped Brown.
 "At approximately 9:15 p.m., Payne arrived at George Cleghorn's house. Payne asked Cleghorn if he could use his telephone. Payne called someone on the telephone and asked them if they had any bullets for a .22 rifle. Payne also asked Cleghorn if he had any bullets. Cleghorn identified Payne's clothing at trial as the clothing that he was wearing the night of this incident.
 "Shortly after 9:08 p.m., Payne's sister Alma arrived at the West Point Grocery and informed Sergeant Watson that Payne was traveling in a blue Ford Maverick automobile with one missing headlight. Based on the information that Watson received from Payne's sister, Watson ordered the dispatcher to issue an all-points bulletin to be on the lookout for the automobile and to advise all officers that Payne was in the company of Braxton Brown.
 "At 10:00 p.m. that evening, Investigator Ted Manus was at the West Point Grocery taking pictures of the scene when he received a call that gunshots had been heard. He went to see if he could locate the origin of the shots but could not. Manus returned to the store and secured several packages of cigarettes from the store that were found on the floor. He then received a call that Brown had been seen with Payne. Manus also received information that Brown and Payne were seen together at a residence near Bethel. Manus left the store and proceeded to the residence.
 "Mitchell Love, an investigator with the Cullman County Sheriff's Department, arrived at Easterling's residence at approximately 10:15 p.m. Love testified that he located a blue Ford Maverick automobile outside this residence. Love had previously received word to be on the lookout for an automobile matching this description. Love notified the dispatcher that he had located the vehicle and asked for assistance on the scene. Several other officers arrived shortly thereafter. The officers looked inside the vehicle and observed several beer cans, some live [shotgun shells and some] expended shotgun shells and an arm sling.
 "Phillip Lambert, the chief investigator for the sheriff's department, arrived at Easterling's residence. He also looked inside the Ford Maverick and observed two spent shotgun shells, several unspent shotgun shells, and an arm sling. He later called for a tow truck to have the automobile towed to the sheriff's department.
 "At 12:05 a.m., on March 24, 1992, Rebecca Herbstreth, a ticket agent for Greyhound Bus Lines in Birmingham, Alabama, sold someone identifying himself as James Beavers a bus ticket to Key West, Florida. *Page 462 
At trial, Herbstreth identified Payne as the individual who claimed to be James Beavers. Herbstreth testified that she noticed that Payne was wearing a white T-shirt and torn blue jeans that had blood stains on them. Herbstreth further testified that Payne had cuts on his face. Payne gave Herbstreth a gold chain when he bought his ticket. Herbstreth identified this gold chain at trial. The chain was subsequently identified by the victim's son as one offered for sale from West Point Grocery. Payne handed out cigarettes to passengers while waiting for his bus and also helped one individual pay for a bus ticket. Herbstreth testified that Payne had tied to his waist a blue money bag that contained a lot of money. Herbstreth stated that Payne told her he received this money from the sale of his automobile.
 "At approximately 7:50 a.m. on the morning of March 24, 1992, a man walked into the Greyhound Bus Station in Birmingham with a wallet that he had found about a block away. Herbstreth was still working. She called the Birmingham police. Herbstreth looked in the wallet and found Braxton Brown's Social Security card inside. Herbstreth identified the wallet at trial. Inside were nine different credit cards, all of which had Braxton Brown's name on them.
 "On March 24, 1992, Officer Mitchell Love went to Payne's mother's residence. Payne's sister, Alma Lee, was present at the residence. Lee gave Love a double-barreled shotgun that she had in the trunk of her automobile. At trial, Love identified the shotgun that he received from Lee. It is the same shotgun that Walker identified as Payne's shotgun.
 "Also on March 24, 1992, Deputy Sheriff Sidney Yarbrough searched the blue Ford Maverick automobile that had been towed from Easterling's house the night before. Inside he found two spent shotgun shells and four shotgun shells that had not been fired. He identified these shells at trial. Yarbrough also found a blue arm sling in the automobile, which he identified at trial.
 "Volunteer fireman John Hardin, a resident of West Point, searched for Braxton Brown on the morning of March 24. He went to a bridge on Crooked Creek near West Point. He noticed a dark colored substance on the bridge and on the railing of the bridge. He discovered a partial dental plate on the bridge. He contacted the sheriff's department.
 "Phillip Lambert, Ted Manus, and Anthony Dotson arrived at the bridge. Lambert observed red stains on the bridge and the partial plate. Lambert also observed a broken set of eyeglasses and a lens on the bridge. These glasses were subsequently identified by the victim's son as belonging to his father. Manus discovered a body in the creek. When the body was brought up from the creek, Manus observed that most of the face was missing. Dotson, who was serving as the coroner on this date, was present when the body was removed from the water. Dotson testified that the victim had suffered two gunshot wounds to the face. There were two large holes in the face — one in the victim's forehead and one in his mouth. Dotson knew Brown and identified the victim as Braxton Brown.
 "Lambert testified that he believed that the holes in the victim's face were the result of a shotgun blast. The victim's body was taken to Moss Funeral Home and was later released to Peggy Lindsey of the Alabama Department of Forensic Sciences for an autopsy.
 "On March 25, 1992, a detective from the Metro Dade County Police Department in Miami, Florida, received a telephone call that Payne was due to arrive at the Greyhound bus station in Miami. The Cullman authorities provided Detective John Robert Butchko with Payne's description and informed him that Payne was involved in a robbery-murder in Cullman, Alabama. Butchko also received information that Payne would be carrying a green duffel bag and was probably armed. Butchko was further informed that Payne was likely traveling under the name of James Beavers.
 "Based on this information, Butchko arrived at the Greyhound bus station and awaited the arrival of Payne's bus. A security guard held everyone on the bus so *Page 463 
that Butchko could identify the people exiting. Butchko approached Payne, who was carrying a green duffel bag, after he exited the bus. Payne identified himself as James Beavers. Butchko was about to pat Payne down for weapons when Payne informed him that he had a .25 caliber gun in his right rear pocket. Butchko identified a Sterling .25 caliber automatic pistol at trial as the gun that he removed from Payne's pocket. This is the same gun that Sandra Walker previously identified as the gun she saw Payne with at Easterling's house when he was with the victim. This gun was also identified at trial by the victim's son as having belonged to his father. Butchko also removed Payne's wallet from his pocket. The identification in the wallet was that of Max Landon Payne. Butchko identified the wallet and its contents at trial.
 "Payne was subsequently transported to the homicide division of the Metro Dade County Police Department. Butchko saw Payne again in an investigation room at the station. Butchko asked Payne if he could search his green duffel bag. Payne subsequently signed a consent form allowing Butchko to search the duffel bag. The consent form was admitted into evidence and identified at trial. Upon searching the duffel bag, Butchko found many items, including the following that he identified at trial: a jeweler's invoice made out to West Point Grocery; a Greyhound bus ticket in the name of James Beavers; a State of Alabama vehicle registration in the name of Braxton Brown; three cartons of Marlboro cigarettes; three First Alabama Bank deposit bags containing numerous checks written to West Point Grocery, credit card receipts, rings, and food stamps; bank receipts in Braxton Brown's name; $196.54 found in Payne's wallet; and $889.30 found in the bank bags. Many of these items were subsequently identified by the victim's son as coming from West Point Grocery.
 "Further testimony was heard from Peggie Lindsey, an investigator with the Alabama Department of Forensic Sciences. Lindsey transported Brown's body to Birmingham for an autopsy. Dr. Joseph Embry performed the autopsy, and Lindsey assisted. Lindsey testified that Embry removed around 466 shotgun pellets from the victim's skull. Lindsey also testified that Dr. Embry removed a blood sample from the victim, which she later delivered to a serologist in Huntsville. Lindsey testified that the victim died from the gunshot wounds to his head.
 "Brent Wheeler, with the Alabama Department of Forensic Sciences in Huntsville, examined the shotgun pellets, the shotgun, and the two spent shotgun shells found in Payne's automobile. He also examined the pellets that were taken from the victim's skull. Wheeler concluded that the pellets removed from the victim's head represented the pellets of two shotgun shells, maybe three. He also testified that the two spent shotgun shells that were found in Payne's automobile were the same type of shells that had been used to shoot the victim. Wheeler further testified that the two expended shells found in the automobile had been fired from Payne's shotgun that had been taken from the trunk of his sister's automobile. Wheeler stated that the pellets taken from the victim's skull could have come from the two empty shotgun shells found in the automobile. Wheeler testified that it was his opinion that the victim was shot from a distance of one to one and one-half feet.
 "Morris Glen Brown, a serologist for the Alabama Department of Forensic Sciences, tested a blood sample taken from the victim. Brown testified that the victim's blood was 'type — ABO, type was type O, Erythrocytic D-type 2-1 PGM, type 1, DAP, type B.' Brown also tested a human tissue sample taken from Payne's arm sling. He testified that the tissue on the arm sling could have been the victim's because of 'blow-back' from the shooting of the shotgun.
 "Roger D. Morrison, from the Department of Forensic Sciences, tested a blood sample from the victim and a blood sample from Payne. He also tested the tissue sample taken from the arm sling. He conducted an HLA DQ Alpha test for the purpose of a DNA comparison. He concluded *Page 464 
that the tissue from the sling and the bloodstain from the victim were both of the same HLA DQ Alpha type. According to him, this type appears in approximately six percent of the population. The test he performed was an exclusionary test, and he concluded that there was a 94% chance that the tissue taken from Payne's sling was the victim's tissue. He further concluded that the tissue taken from the sling could not have come from Payne himself. Payne presented testimony from 10 witnesses in an effort to show that it was possible that another man, by the name of James Beavers, could have committed this murder. Evelyn Smith, who passed the victim and Payne as they left Easterling's house on the night of the murder, testified that she heard her husband say 'Hi, James, how are you?' Smith further testified that the only James she knows is James Beavers. Kelley Mosley, who was across the street from the West Point Grocery on the night of March 23, 1992, testified that she saw a blue Ford Maverick automobile at the store at around 9:00 p.m. and that there were three people in the automobile. The one in the backseat, she testified, had shoulder-length hair. James Beavers, who has shoulder-length blond hair, testified that he lived across the street from Easterling in March 1992. Beavers testified that he did see Payne on March 23, when he helped him fix his automobile. He denied having any knowledge of the crime. Christine Hyde testified that she had a conversation with James Beavers in December 1992 in which Beavers admitted to shooting the victim in the face. Becky Graves testified that she was in the West Point Grocery at about 8:10 p.m. on March 23, 1992. She said that while she was in the store she saw a man with shoulder-length blonde hair. An affidavit from Tracey Shields was read into evidence. Shields stated that she saw Payne pull up to his mother's house at around 9:15 p.m. on March 23, 1992, and stated that she saw another person in the automobile with long hair. Payne did not testify.
 "The state subsequently presented several rebuttal witnesses. Most of these witnesses were people who testified that James Beavers was at home on the night of this incident and that he did not leave his house on that night."
683 So.2d at 443-47.
1. Did the Court of Criminal Appeals correctlyhold that certain comments made by the prosecutorduring closing arguments did not infringe uponPayne's right to remain silent?
Payne argues that comments made by the State in its closing arguments prejudiced him; he contends they were directed at his constitutional right not to testify. He says the comments by the State led the jury to believe that people are more likely to be innocent if they themselves testify rather than rely on the testimony of other persons. The State argues that the comments, taken in the context of the entire closing arguments, do not constitute reversible error.
The United States Supreme Court held in Griffin v.California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), that a prosecutor's direct comment on the defendant's failure to testify violates the defendant's rights under the Fifth and Fourteenth Amendments to the United States Constitution. Also, an indirect statement, one of such character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify, violates the defendant's constitutional rights. Marsden v. Moore, 847 F.2d 1536 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534,102 L.Ed.2d 566 (1988). Also, such a statement violates the defendant's rights under the Alabama Constitution. Beecher v. State,294 Ala. 674, 320 So.2d 727 (1975).
Because Payne did not object at trial to the comments he now complains of, we must review the statements under the plain error rule and take appropriate action if plain error is evident, even though the error was not complained of at trial. Rule 45A, A.R.App.P.; Powell v. State, 631 So.2d 289
(Ala.Crim.App. 1993). The plain error rule requires not only that the claimed error seriously affected substantial rights of the defendant, but also that the error had an unfair prejudicial impact on the jurors' deliberations. United *Page 465 States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1
(1985).
At trial, Payne's defense was that a man named James Beavers committed the crime. In discussing this defense, the prosecutor asked the jury to compare the evidence against Beavers with the evidence that Payne committed the murder:
 "[Beavers's] mother, Mrs. Reynolds, said he was there all that time. [His ex-girlfriend's] son, Terry, said he was there that night. The police, by their own testimony, continued to investigate. Every time they would receive an additional report, they would go out and see if they could find James Beavers. . . . The investigation continued. On each occasion, there was no evidence to tie Mr. Beavers to this situation. He was available in court to testify. Let's go over to the other side and say [see] what evidence and what circumstances do you have against the defendant. As I say, I have always felt what a person does is more reliable than what [is] said by a third party or whoever. When we go through these, ask yourself, 'Is that consistent with a person who is not the defendant or the one that is guilty of the crime?' "
R.T. 747 (emphasis added).
We note that defense counsel's failure to object to these comments does not prevent our review. However, the failure to object should be weighed as part of our evaluation of the comments, because the failure to object may suggest that the defense did not consider the comments to be particularly harmful. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied,474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
We agree with the Court of Criminal Appeals that UnitedStates v. Chandler, 996 F.2d 1073, 1094-95 (11th Cir. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2724, 129 L.Ed.2d 848
(1994), is persuasive regarding the interpretation of the prosecutor's comments. In Chandler, the court reviewed the prosecutor's statement that the defendant, Chandler, was more culpable than one of his cohorts, Charles Ray Jarrell, who testified for the prosecution. In that argument, the prosecutor made the following comments:
 "You've heard several times that in return for his cooperation in this case . . . the United States government and the State of Alabama have agreed to recommend a 25-year sentence without parole for Charles Ray Jarrell. . . .
 "Now, the defendant will no doubt argue this simply is not somehow not [sic] fair. Charles Ray Jarrell came here before you and testified before you. You were able to hear his testimony. He came in here, admitted what he did, came in here and told you what he did, what kind of person he is and [it] isn't anything to write home about, there is no question about that. But I submit to you that a man that was willing to solicit two different prospective killers on at least three different occasions, a man who was willing to provide money to people to perform the act, a man who was willing to provide weapons to complete the act and a man who is cunning and manipulative is a far more dangerous individual than a self-confessed town drunk living hand to mouth who allows himself to be manipulated into actually doing this terrible act."
Id. at 1094 (emphasis added).
In reviewing these remarks, the court stated:
 "Viewed in the context in which the statement was made, we find that the prosecutor's statement was not improper. A common sense reading of the statement suggests that the prosecutor was arguing that Jarrell was not as culpable as Chandler. The argument was based, not on Chandler's failure to testify, but on the facts elicited from Jarrell's testimony. A jury would not naturally take the argument to be a comment on Chandler's failure to testify, nor is it obvious that the remark was so intended."
Id. at 1095.
Based on the foregoing, we hold that the prosecutor's comment did not constitute an impermissible comment on Payne's right to remain silent. The comment, read in context, was not a direct or indirect comment on Payne's failure to testify. A jury would not naturally and necessarily infer that this was a comment on Payne's failure to testify. *Page 466 
Rather, it was a summation of the defense's case versus the evidence presented by the State, Payne's defense being that someone else killed Brown.
This case is similar to Dill v. State, 600 So.2d 343
(Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), wherein the prosecutor stated that the defendant's brother was the only one from whom the jurors had heard; the statement was held not to be a comment on the defendant's silence. The comment, read in context, was that the defendant's brother, who testified for the prosecution, was the only one who told the truth. The prosecutor then went through a lengthy summation of the testimony that supported the brother's testimony. This was made in response to defense counsel's closing argument, which had attacked the brother's credibility; the comment was held not to amount to plain error.
Payne argues that the following comments by the prosecutor were also an impermissible reference to his right not to testify:
 "It is pretty clear up to the point they leave the house here at nine o'clock that evening — not much conjecture can be involved as far as that. After that, that is the last time Braxton Brown was seen alive. He was with the defendant. We assume from the time frame that [Payne] left here, came back up here, and went down this road here, going back to the West Point Grocery. The conjecture arises 'What happened during that time frame?' I don't know. I don't know whether [Payne] asked for the magazine back and Braxton Brown said 'No way.' I don't know if he saw a patrol car. You see, . . . [Payne] . . . doesn't know any alarm has gone off. He doesn't know that the police know anything. He may have passed a patrol car going from the West Point Grocery over here to where [Payne] lives, and he may have panicked. He may have thought that Wilma turned him in. He may have thought, 'Now I have no choice.' Or he may have got down here and said, 'Braxton, I'm going to let you out here and I'm going to cut a trail here. By the time you get back up here to get help, I'll be long gone. Let's make a deal. If I let you out and you don't contact the authorities, we will forget this happened.' Maybe at that point, Braxton said, 'No way. I'm going to call the police when I get a chance.' And [Payne] ended it right there on that bridge. Then he goes to the airport or bus station and buys the bus ticket. . . . Whatever scenario you think fits, something between here and there happened. That is for you to decide. The end result is that [Payne] undoubtedly was here on this bridge and did the murder on that occasion."
R.T. 755-57. (Emphasis added.)
As with the earlier comments, Payine's counsel apparently did not find these statements to be particularly harmful, because he did not object. Again, we must review them under the plain error rule and weigh the lack of an objection as part of our evaluation of the comments.
Before making these comments, the prosecutor told the jury that witnesses had been presented by both sides and that it was the jury's duty to determine which, if any, statements made by a witness it believed. He also told them that in closing arguments both sides may make inferences from the evidence and that the jury could agree or disagree with those inferences. He also stated that it was the prosecutor's job to re-create through the testimony of witnesses what the circumstances were on the day of the murder. He also for some of his argument uses the term "we," e.g., "we assume that . . ." and "there's no way we could rebut that." As for the use of the word "we," the prosecutor was referring to the fact that more than one prosecutor tried the case.
Viewing the comments Payne claims are improper in light of earlier comments made by the prosecutor during closing arguments, we conclude that no error occurred. The prosecutor was merely summarizing the case and commenting on inferences from the evidence presented. That is, the prosecutor was merely commenting that even though the prosecution had not been able to reconstruct every event of the evening, one could reasonably infer from the evidence presented that Payne was guilty. *Page 467 
It is well settled that the State can comment on the fact that its evidence is uncontradicted or has not been denied.Ex parte Wilson, 571 So.2d 1251 (Ala. 1990); Ex parte Williams,461 So.2d 852 (Ala. 1984). However, the prosecutor cannot make comments that invade the right of the defendant not to testify.Id. We hold that the prosecutor's comments did not invade that right.
Also, we note that in his closing arguments Payne's counsel used these same inferences drawn from the prosecutor's inability to reconstruct every event of the evening. He commented on the fact that the State did not know what had happened on the bridge and did not prove what happened, or who did what, to the victim. He also commented on what Beavers could have been doing at the time at which the State says the jury could infer that Payne was committing the murder. Payne's counsel stated that the State said "maybe this happened or maybe that happened," but that a guilty verdict was "too important to be based on speculation."
2. Did the trial court err in failing to givecertain jury charges requested by Payne?
Payne requested the following jury instruction:
 "I charge you, the Jury, that if the circumstances as proven are capable of explanation of any reasonable hypothesis consistent with the Defendant's innocence and if the circumstances are capable of such explanation, then the defendant should be acquitted."
The court denied this charge and instructed the jury, in pertinent part, as follows:
 "The evidence that I have talked to you about in this case is evidence that has been testified to or introduced in some way. Now, some of the evidence in this case has been what we call circumstantial. Circumstantial evidence is defined under the law as positive proof of circumstances or facts sought which tend to prove the existence of other facts sought to be proven. Circumstantial evidence is an inference that is drawn from certain physical facts that are found as a result of the evidence. As I told you, the defendant in this case is presumed to be innocent. When part or all of the evidence that is relied on by the prosecution in a case is circumstantial, the chain of circumstances must be so complete and of such a character so as to convince you beyond a reasonable doubt and to a moral certainty of the defendant's guilt. The evidence must be so strong and cogent as to show the defendant's guilt beyond a reasonable doubt, then you should find the defendant not guilty [sic].
 "A conviction may be had upon evidence which is partially circumstantial so long as the evidence is so strong and cogent as to prove the guilt of the defendant to a moral certainty and beyond a reasonable doubt. A conviction may not be had upon circumstantial evidence if there is an inference consistent with the innocence of the defendant. Evidence of circumstantial nature may be sufficient to convict if such evidence convinces the jury beyond a reasonable doubt of the guilt of the accused. What I just told you there is if some of the evidence relied on is circumstantial, the burden is the same. The State must prove to you through those circumstances the guilt of the defendant beyond a reasonable doubt. That would be the duty that would be placed upon the State in this case."
R.T. 815-17 (emphasis added).
Payne argues that "inference," as that term is used in the court's jury charge, does not mean substantially the same as "hypothesis," as used in Payne's requested jury charge. The State contends that there was no need for the trial court to give the jury charge requested by Payne because, it argues, the charge given by the trial court substantially covered the same subject matter.
We agree with the statement of the Court of Criminal Appeals that "the state is not asked to eliminate every single hypothesis inconsistent with the defendant's guilt," rather "only such hypotheses as are reasonable, springing from a consideration and comparison of the entire evidence." 683 So.2d at 452, quoting Crawford v. State, 112 Ala. 1, 21 So. 214
(1896), and Cox v. State, 373 So.2d 342, 345 (Ala.Cr.App. 1979). *Page 468 
Black's Law Dictionary 743 (6th ed. 1990), defines "hypothesis" as "A supposition, assumption, or theory; a theory set up by the prosecution, on a criminal trial, or by the defense, as an explanation of the facts in evidence, and a ground for inferring guilt or innocence, as the case may be, or as indicating a probable or possible motive for the crime." (Emphasis added.)
In support of his argument, Payne cites Ex parte Smiley,655 So.2d 1091 (Ala. 1995), for the proposition that the judge should have used the word "hypothesis" rather than "inference." However, Smiley differs from this case in that it did not address a jury charge; rather it addressed the sufficiency of the evidence in a murder case. We stated in Smiley that a person's presence at the scene of a crime is not enough to justify a conviction for the crime, but that the person's presence at the scene, taken along with other facts and circumstances tending to connect that person with the crime, may be enough to support a conviction. 655 So.2d at 1094. We also set out in Smiley the applicable test:
 "[W]hether a jury might reasonably find that the evidence excluded every reasonable hypothesis
except that of guilt; not whether the evidence
excludes every reasonable hypothesis but guilt, but rather whether a jury might reasonably conclude
that it does. . . . Stated differently, to support the jury's verdict of guilty, circumstantial evidence and reasonable inferences therefrom have to be inconsistent with any rational hypothesis of innocence."
655 So.2d at 1094. (Emphasis added.) The test inSmiley states that an inference or a hypothesis of innocence must be a reasonable one.
The refusal of a requested written instruction is not a cause for reversal, even if the requested charge is a correct statement of the law, so long as it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge or in other charges given at the request of the parties. Rule 21.1, Ala.R.Cr.P.; Marek v. State,556 So.2d 383 (Ala. 1989) (if requested charge is subsumed in the court's oral charge, the refusal of the charge is not error under Rule 14, Temp. Ala.R.Cr.P.).
We hold that the charge given in this case did substantially and fairly state the same rule of law that was stated in the charge Payne requested. In summary, the trial court's charge refers to the use of circumstantial evidence in the case; it clearly indicates that the State must prove its case beyond a reasonable doubt; and, finally, it states that the defendant cannot be convicted if the evidence leads to an inference consistent with innocence.
3. Was Payne denied his right to a speedy trial?
Payne argues that he was denied his Sixth Amendment right to a speedy trial because there was a 25-month delay between his indictment and his trial. Payne contends that the Court of Criminal Appeals erred in its application of the following factors set out in Barker v. Wingo, 407 U.S. 514,92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), for a court to consider when analyzing a speedy-trial claim: (1) the length of the delay; (2) reasons for the delay; (3) when the defendant asserted his right to a speedy trial; and (4) any prejudice that the defendant has suffered because of the delay.
Payne argues that the court erred in weighing theBarker factors by not including in the "length of the delay" the six months it took to "find a judge to hear the case." He contends that the six months that passed between the retirement of one judge and the appointment of another should have been weighed against the State.
The procedural history of Payne's case is as follows:
March 25, 1992 — Payne was arrested in Dade County, Florida. (C.R.49.)
April 16, 1992 — Payne was indicted by a Cullman County grand jury on three counts of capital murder. (C.R.2.)
April 22, 1992 — Payne made his initial appearance in court. (C.R.3-4.)
April 29, 1992 — Payne moved to dismiss the indictment. (C.R.17-18.)
April 30, 1992 — Payne filed 4 motions: (1) a motion to compel the state to elect whether to proceed on the first, the second, or the *Page 469 
third count of the indictment; (2) another motion to dismiss the indictment; (3) a petition for psychiatric evaluations to determine his competency at the time of the offense and his competency to stand trial; and (4) a motion to vacate the State's discovery order and for a protective order, requesting that the State be prohibited from taking hair, blood, saliva, and urine samples. (C.R.20-30.)
May 6, 1992 — Payne moved for a continuance on his motion for psychiatric evaluations, which was scheduled to be heard on May 7, 1992; Payne moved for a change of venue and requested a hearing on this issue. (C.R.34-35.)
May 7, 1992 — Payne filed an ex parte application for investigative expenses, requesting a hearing on the issue; Payne also moved for permission to file other motions. (C.R.38-48.)
May 8, 1992 — Payne moved to suppress his statement and requested a hearing on this issue. (C.R.49-54.)
May 13, 1992 — Payne moved to suppress certain physical evidence and requested a hearing on this issue. (C. 55-58.)
May 14, 1992 — Payne moved to continue the trial, which was set for May 18, 1992. (C.R.59-59A.)
June 10, 1992 — Payne moved to continue the the psychiatric evaluation and change of venue hearings. (C.R.60-61.)
July 15, 1992 — Payne again moved to continue the hearings on the psychiatric evaluation and change of venue. (C.R.62-63.)
September 3, 1992 — The hearing on Payne's motion for psychiatric evaluation and change of venue was held. The trial court ordered psychiatric evaluations for Payne and denied the change of venue motion. (Supp.vol.3, 1-84.) (C.R.64-65.)
October 26, 1992 — The trial court found Payne competent to stand trial and set trial for December 14, 1992. (C.R.66-67.)
November 30, 1992 — Payne requested to individually voir dire the jury and to sequester those who had been questioned individually from those who had not. (C.R.68-80.)
December 1, 1992 — The State moved to continue the trial, which was set for December 14, 1992, because the blood-type analysis had not been completed. (C.R.81-82.)
December 17, 1992 — Payne moved for a pretrial determination of the admissibility of certain evidence, specifically requesting a hearing 60 days before trial. (C.R.85-86.)
December 18, 1992 — The trial court set a hearing for a pretrial determination of the admissibility of evidence, for January 7, 1993. (C.R.210.)
January 7, 1993 — At the hearing, the trial court ordered the State and Payne to file briefs on the legal issues presented regarding the admissibility of certain evidence. (Supp.vol.4, pp. 1-205.) (C.R.208.)
January 20, 1993 — The State moved to extend the time for filing the requested briefs. (C.R.87-88.)
January 21, 1993 — The trial court extended the time to file briefs, to February 10, 1993. (C.R.208.)
February 5, 1993 — Payne moved to further extend the time for filing briefs; the trial court extended the time to March 10, 1993. (C.R.89-90, 208.)
March 19, 1993 — The State moved to continue the trial, which had been set for March 22, 1993, because DNA testing had not been completed. (C.R.90-91.)
March 25, 1993 — The trial court denied Payne's motion to suppress his statement and certain evidence seized from his automobile. (C.R.97-98.)
April 10, 1993 — Payne petitioned the Court of Criminal Appeals for a writ of mandamus, challenging the trial court's denial of his motion to suppress his statement and evidence seized from his car. (C.R.208.)
April 12, 1993 — Payne filed an ex parte request for investigative expenses. (C.R.91-97.)
April 13, 1993 — The trial court granted Payne's request for investigative expenses. (C.R.211.)
April 23, 1993 — The Court of Criminal Appeals denied Payne's petition for the writ of mandamus. Ex parte Payne,626 So.2d 651 *Page 470 
(Ala.Crim.App. 1993); Payne petitioned this Court for a writ of mandamus. (C.R.97-98.)
May 14, 1993 — Payne moved for a continuance pending this Court's ruling on the mandamus petition. (C.R.99-100.)
June 9, 1993 — the trial court continued the trial, pending this Court's review of Payne's petition and pending resolution of Payne's motion concerning out-of-state witnesses. (C.R.101-02.)
June 14, 1993 — This Court denied the writ of mandamus. (C.R.103.)
August 30, 1993 — Payne moved for production of witnesses, an incarcerated person; he also petitioned for certification of the materiality of out-of-state witnesses. (C.R.103-108.)
September 10, 1993 — The presiding judge in the circuit denied both of the motions filed on August 30, 1993, noting that the trial date had not been set, because of the retirement of Judge Riley. (C.R.108-09, 211.)
November 10, 1993 — Payne moved for a speedy trial. (C.R.112.)
November 12, 1993 — Payne again moved for production of witnesses and a certification of materiality of out-of-state witnesses. (C.R. 113-19, 122.)
January 12, 1994 — Newly appointed Circuit Judge Frank Brunner recused because he had previously been appointed guardian ad litem for the victim's minor daughter. (C.R. 211.)
January 14, 1994 — Payne again moved for a speedy trial. (C.R.124-25.)
January 24, 1994 — The presiding circuit judge recused because he had just had surgery and was still recuperating. (C.R.211.)
January 25, 1994 — The presiding circuit judge notified the Chief Justice of this Court of his recusal and requested that the case be assigned to another circuit judge. (C.R.126.)
January 28, 1994 — Payne filed a motion for the court to reconsider all previously filed motions. (C.R.127.)
February 3, 1994 — This Court entered an order appointing Judge Robert Austin to hear the case. Judge Austin set a pretrial conference for February 14, 1994. (C.R.129-130.)
February 14, 1994 — Payne made a motion in limine. (C.R.131-34.)
March 7, 1994 — Payne moved to dismiss the indictment, alleging a failure to give him a speedy trial. (C.R.136-38.)[1]
March 11, 1994 — The motion to dismiss was denied and trial was set for May 23, 1994. (C.R.138-39.)
May 3, 1994 — Payne moved for production of witnesses and a certification of the materiality of an out-of-state witness, for the third time. (C.R.140-143.)
May 23, 1994 — The trial began. (R.T. 1.)
The Court of Criminal Appeals held that the delay of 25 months between indictment and trial was not presumptively prejudicial, because much of the delay was due to the problem of finding a judge to hear the case. That court wrote, "This delay is not attributable to either the prosecution or Payne." 683 So.2d at 452. The court reviewed the remainingBarker factors and found no violation of Payne's right to a speedy trial.
Payne contends that the Court of Criminal Appeals should have weighed against the State the delay due to the problem of finding a judge to hear the case. The United States Supreme Court has written:
 "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."
Barker, 407 U.S. at 531, 92 S.Ct. at 2192.
We must consider the Barker factors. There were 25 months between indictment *Page 471 
and trial. There were several reasons for the delay of the trial: From Payne's April 16, 1992, indictment to the first setting of trial — for May 18, 1992 — Payne filed at least 9 motions, including a motion for a continuance. From June 10, 1992, to September 3, 1992, Payne filed several motions, including a motion for a psychiatric evaluation and for a hearing on that motion. On October 6, 1992, the trial court found Payne competent to stand trial and set trial for December 14, 1992. On December 1, 1992, the State made its first motion for a continuance. On December 17, 1992, Payne moved for a pretrial hearing on whether to suppress certain evidence. The requested hearing was set for January 7, 1993.
At the hearing, the trial court ordered the parties to file briefs. Subsequently, both the State and Payne requested additional time to file their briefs. On March 19, 1993, the State moved for a continuance because DNA testing was not complete. On March 25, 1993, the trial court denied Payne's motion to suppress. In April 1993, Payne asked for investigative funds, which the trial court granted. Also in April, Payne petitioned the Court of Criminal Appeals for a writ of mandamus regarding the suppression issue. The writ was denied on April 23, 1993. Payne then petitioned this Court for a writ of mandamus regarding the suppression issue. On May 14, 1993, Payne moved for a continuance pending this Court's ruling on the mandamus petition. The trial court granted the continuance on June 9, 1993. On June 14, 1993, this Court denied the writ.
The delay caused by the retirement of one judge and the recusal of two others began in September 1993 and ended on February 3, 1993, when this Court appointed a judge to hear the case. On September 10, 1993, the presiding circuit judge denied two of Payne's motions regarding witnesses because the trial judge sitting on the case had retired. Two months later, on November 10, 1993, Payne moved for a speedy trial. Until November 1993 — 19 months after the indictment — Payne had not asserted his right to a speedy trial. On November 12, 1993, Payne filed another motion regarding witnesses.
The next action in the case occurred on January 12, 1994, when a new judge was appointed for the circuit in which Payne had been indicted. That same day, the new judge recused, because of a conflict of interest arising from the fact that he had been guardian ad litem for the victim's minor daughter. On January 14, 1994, Payne again moved for a speedy trial. On January 24, 1994, the presiding judge in the circuit recused because of health problems. On January 25, 1994, he notified the Chief Justice of his recusal, and on February 3, 1994, this Court appointed another judge to hear the case. On that same day, the trial judge set a pretrial hearing for February 14, 1994. On March 7, 1994, Payne filed a motion to dismiss, alleging a denial of a speedy trial[2] — that motion was denied on March 11, 1994. The trial began on May 23, 1994.
Payne contends that it should be presumed that he suffered some prejudice by the 25-month delay. He argues that there was no need for him to present any evidence of prejudice, arguing that under Barker a showing of prejudice comes from the fact of "pretrial incarceration" and from witnesses' "loss of memory" occurring because of the length of time, citing Barker407 U.S. at 532, 92 S.Ct. at 2193.
Whether a defendant has been denied the constitutional right to a speedy trial cannot be determined by an inflexible rule, but must be determined on a case-by-case basis. In determining that question, a court must weigh the conduct of the prosecution and the conduct of the defense. Barker,407 U.S. at 530, 92 S.Ct. at 2191-92.
Looking at the Barker factors and the facts presented in this case, we cannot say that Payne was denied his right to a speedy trial. Weighing any presumed prejudice from the 25-month delay and attributing to the State the 6-month delay caused by the lack of a trial judge, we must conclude that Payne was not denied a speedy trial. It is *Page 472 
undisputed that Payne did not assert his right to a speedy trial until 19 months after the indictment had been filed. The State did not purposefully attempt to delay the trial, and any delay caused by the lack of a judge should be weighed less heavily against the State than a purposeful delay, according toBarker.
In weighing any prejudice Payne might have suffered, we consider the interests the right to a speedy trial was designed to protect, i.e., preventing oppressive incarceration, minimizing the defendant's anxiety, and, most important, limiting the possibility that the defense will be impaired.Barker. Because Payne presented no specific incidents of prejudice or impairment to his defense, we have looked at any presumed prejudice to Payne. Although between the indictment and the trial Payne spent 25 months in jail and certainly was anxious as to the outcome of his case, we cannot say that this alone is enough to outweigh the other factors. Payne contends that witnesses' loss of memory also prejudiced him. However, Payne does not point to any specific witness who failed to remember the events of the alleged offense. Even presuming some prejudice based on loss of memory as loss of memory, given that loss of memory is rarely reflected in the record, we cannot say that this factor would outweigh the other factors. We note that the State's case would also be affected by witnesses' loss of memory occurring because of the delay in trial; however, this loss of memory can work to the defendant's favor.
We hold that the Court of Criminal Appeals did not err in determining that Payne was not denied his right to a speedy trial.
4. Did the trial court commit reversible error byadmitting evidence obtained during what Payne sayswas an illegal search of his automobile?
We agree with the reasoning of the Court of Criminal Appeals on this issue, and we adopt it as our own:
 "At a suppression hearing, Cullman County Sheriff's Deputy Mitch Love testified as follows. On March 23, 1992, he received a number of radio transmissions regarding a robbery-abduction at West Point Grocery. The sheriff's deputies were given a description of the suspect, Max Payne: a white male, driving a light blue Ford Maverick, and carrying a shotgun. Love drove to Payne's residence. Payne was not there, but his mother and his sister, Wilma Faye Easterling, were. Love spoke to Easterling and to Payne's mother. Easterling told Love that when she was at her house earlier that evening, Payne had arrived with Brown, bank deposit bags, and a weapon. She further stated that Payne left her house in the Maverick with the victim. After this conversation, Love left Payne's house and continued searching for the Maverick. He found it parked at Easterling's house, and called for assistance. The automobile windows were down, and Love looked into the automobile with his flashlight. He observed empty beer cans, shotgun shells on the floorboard, a sling in the back seat, and keys in the ignition. Sheriff Laney and Officers Yarbrough, DeMonia, Nichols, and Weston joined Love at the automobile a few minutes after Love called for assistance. Sheriff Laney removed the keys from the ignition.
 "Sheriff Laney testified as follows. He was investigating the crime when he heard Love's call. Laney was one of the first to arrive on the scene with Love. He looked into the automobile and saw the same things Love testified to seeing. He removed the keys from the ignition and opened the trunk. The victim's whereabouts were not known at that time. Laney stated that when he looked in the trunk, he was looking for the victim.
 "Phillip Lambert, chief investigator for the Cullman County Sheriff's department, testified as follows. Lambert arrived after the trunk had been searched. He looked into the automobile and observed the same items Laney and Love testified to seeing, with the exception of the automobile keys. Lambert then spoke with Easterling. She told him that the Maverick parked on the property was the same automobile Payne was driving when he left with Brown. She also told Lambert that he and the other officers 'could look in it, do what [they] *Page 473 
wanted to, take it with [them] or anything [they] wanted to do.' Lambert then determined that Easterling and her husband were renting the property upon which the automobile was parked. Ted Manus obtained Easterling's written consent to search the premises. The sheriff called for a wrecker, and the Maverick was towed to the sheriff's department, where it was locked and later searched.
 "Generally, a valid warrantless search must be accompanied by certain circumstances that would render the act of obtaining a warrant either useless or unreasonable. One such situation in which a warrant is not required is when exigent circumstances exist concurrently with probable cause. Land v. State, 678 So.2d 201 (Ala.Cr.App. 1995) (holding that warrantless search of appellant's vehicle was valid because the police had probable cause to believe that appellant had committed the crime, and the vehicle's inherent mobility was a sufficiently exigent circumstance); see also Johnson v. State, 554 P.2d 51
(Okla.Crim.App. 1976), cert. denied, 429 U.S. 943, 97 S.Ct. 364, 50 L.Ed.2d 314 (1976) (holding that immediate warrantless search of the trunk of defendant's automobile was proper, because the police believed the kidnapped victim was in there and were acting 'in hopes of saving a human life').
 "In this case, the police had the following information before they removed the automobile keys and opened the trunk: that Brown's grocery store had been robbed by a white male with a shotgun; that the suspect was driving a light blue Ford Maverick; that Brown had been abducted; that after the robbery, Payne drove to Easterling's house in his light blue Ford Maverick; that when he arrived there, Brown was with him and he had bank deposit bags and a gun; that Payne left Easterling's house in his Maverick with Brown, the bank deposit bags, and the gun; that the Maverick was not parked in front of Easterling's house between 10:00 p.m. and 10:15 p.m., but that it was parked there at 10:30 p.m. Therefore, the police had sufficient information to ' "warrant a man of reasonable caution in the belief" ' that several crimes had been committed, that the appellant had committed them, and that the vehicle contained evidence of the crimes. Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502, 514
(1983) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555
(1925)).
 "Furthermore, in cases involving searches of automobiles the vehicle's inherent mobility establishes a presumption of exigent circumstances. Mewbourn v. State, 570 So.2d 805, 810 (Ala.Cr.App. 1990) ('a vehicle's potential for mobility raises the presumption of exigent circumstances'). In this case, however, the vehicle's mobility was accompanied by several additional exigent circumstances. For example, the Maverick had been returned to Easterling's house less than 30 minutes before Love located it. Love testified that he called for backup and that the whereabouts of Payne and the victim were unknown at that time. Laney testified that he looked inside the automobile to determine whether anyone was hiding in the automobile. Laney further testified that he removed the keys from the ignition in order to open the trunk to search for the victim. We conclude that the police had sufficient probable cause to search the automobile, and that the concomitant exigent circumstances were overwhelming; therefore, the warrantless visual search of the interior and the trunk of the Maverick was valid.
 "The Maverick was later towed to the sheriff's department, where it was thoroughly searched. However, before the automobile was towed, Easterling gave her express verbal and written consent to the search. In Johnson v. State, 584 So.2d 881 (Ala.Cr.App. 1991), this court held:
 " ' "A defendant has no constitutional right of privacy where he does not have exclusive possession and control over the place searched. The person who does have present, exclusive possession and control over the place in question, or who shares the premises coequally with the person claiming to be aggrieved, may give consent to search." ' *Page 474 
 "Id., at 886 (quoting C. Gamble, McElroy's Alabama Evidence § 334.01(3)(b) (3d ed. 1977). See also Zumbado v. State, 615 So.2d 1223 (Ala.Cr.App. 1993) (applying this rule in upholding a consensual search where the appellant parked his automobile at the house trailer where he lived with his girlfriend; the girlfriend was present, but the appellant was not; the girlfriend was apparently in exclusive control of the premises; and the girlfriend consented to the search of the automobile).
 "In this case, Payne parked his automobile on property rented by Easterling and her husband. Payne left the windows of the automobile down and left the keys in the ignition. Therefore, Payne did not have exclusive control over the automobile when it was searched. Easterling, in contrast, did have apparent exclusive control of the property, including the automobile. Accordingly, she was capable of giving valid consent to the search of the automobile. She gave her consent; therefore, the warrantless search of the automobile at the sheriff's office was valid.
 "Furthermore, we note that the automobile was in plain view, and the police had probable cause to believe that the automobile itself was evidence of the crimes. See Watson v. State, 533 So.2d 737
(Ala.Cr.App. 1988) ('[P]lain view is obtained without any prior entry or opening of the vehicle. . . . when the car itself is in plain view and it is subject to seizure as evidence of a crime. . . .'); Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Therefore, the warrantless seizure of the automobile was proper."
The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, ALMON, SHORES, HOUSTON, INGRAM, COOK, and BUTTS, JJ., concur.
[1] In his motion to dismiss filed March 7, 1994, Payne claims that he first asserted his right for a speedy trial in "July 1993." However, nothing in the record indicates that to be the case; Payne does not dispute, in his briefs to this Court, that his first motion for a speedy trial was filed on September 20, 1993.
[2] The Court of Criminal Appeals stated that Payne filed his third speedy trial motion on February 14, 1994. 683 So.2d at 451. However, the record indicates that it was filed on March 7, 1994, and Paine does not dispute this. *Page 947